Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XII

| | | |
|---|---|---|
| DIEGO L. MARTÍN COLÓN<br><br>Apelante<br><br><br>v.<br><br><br>YMCA DE SAN JUAN (THE YOUNG MENS CHRISTIAN ASSOCIATION OF SAN JUAN INC.), Y OTROS<br><br>Apelado | KLAN202401038 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>SJ2022CV10652<br><br><br>Sobre:<br>Incumplimiento de Contrato |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Candelaria Rosa, la Jueza Rivera Pérez y la Jueza Díaz Rivera.

Díaz Rivera, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 23 de enero de 2025.

Comparece ante *nos*, Diego L. Martín Colón (apelante) y nos solicita que revisemos una *Sentencia Parcial* emitida el 1 de octubre de 2024 y notificada el 3 de octubre de 2024, por el Tribunal de Primera Instancia (TPI o foro primario), Sala Superior de San Juan. Mediante dicho dictamen, el foro primario determinó que no hubo incumplimiento de contrato por parte de la YMCA de San Juan (YMCA-SJ) con la parte apelante al no existir un contrato de membresía vitalicia. Además, el TPI desestimó las causas de acción de incumplimiento de contrato y daños y perjuicios en contra de Mabel Román y Allan Charlotten, tanto en sus capacidades personales como en representación de la YMCA-SJ.

Por los fundamentos que se exponen a continuación, *confirmamos* la *Sentencia Parcial* apelada.

**I.**

Surge del expediente ante *nos* que, el 6 de diciembre de 2022, la parte apelante presentó una *Demanda* sobre incumplimiento de contrato y daños y perjuicios en contra de la YMCA-SJ, Mabel Román por sí y en representación de la Sociedad Legal de Gananciales compuesta por ella y Fulano de Tal y como Directora Ejecutiva de la YMCA-SJ, Allan Charlotten, por sí y en representación de la Sociedad Legal de Gananciales compuesta por este y Sutana de Tal y como Presidente de la YMCA-SJ y otros.

A grandes rasgos, la parte apelante esbozó que desde el 1966 ha sido miembro de la YMCA-SJ donde ejerció puestos como CEO y Director Ejecutivo de dicha entidad, de modo que la institución le concedió una membresía vitalicia. Esgrimió que, a pesar de ostentar esta membresía vitalicia, el 27 de abril de 2021, la YMCA-SJ por conducto de Mabel Román, Directora Ejecutiva, le envió una misiva donde le indicó que no se le reconocía la membresía vitalicia en la YMCA-SJ, que no se le permitía su acceso a las facilidades por presuntos actos de indisciplina y que de visitar las facilidades se arriesgaría a que la YMCA-SJ tuviera que llamar a la Policía de Puerto Rico.

Así pues, la parte apelante sostuvo que se comunicó varias veces con personal de la YMCA-SJ para que le indicaran las razones. Asimismo, adujo que mientras esperada a que se dilucidara la controversia, le solicitó a la YMCA-SJ la opción de pagar la membresía para utilizar las facilidades, lo cual fue denegado. Manifestó que el 30 de agosto de 2021, la YMCA-SJ le envió una segunda misiva donde le reiteró que no se le permitiría el acceso a su sede ni a ninguna actividad organizada por esta. Así, la parte apelante indicó que la YMCA-SJ está incumplimiento con su contrato de membresía vitalicio, lo cual le ha provocado angustias mentales y daños directos a su reputación como profesional dentro

y fuera de la YMCA-SJ, así como deportista, los cuales estimó en una suma no menor de $150,000.00. Además, la parte apelante solicitó que se active y se le reconozca la membresía vitalicia en la YMCA-SJ o, en la alternativa, se le permita pagar la membresía hasta tanto se resuelvan las controversias.

Consecuentemente, el 9 de febrero de 2023, Allan Charlotten presentó una *Contestación a Demanda.* En ajustada síntesis, acentuó que los estatutos corporativos de la YMCA-SJ no contemplan membresías vitalicias, por lo que cualquier acto realizado por algún director, oficial, empleado o representante de la YMCA-SJ otorgando una membresía vitalicia al apelante o a cualquier otra persona es *ultra vires.* Coligió, además, que no formaba parte de la Junta de Directores de la YMCA-SJ al momento en que la parte apelante aduce que se le concedió una membresía vitalicia, ni se la otorgó en su capacidad personal.

Asimismo, indicó que la YMCA-SJ es propiedad privada y es dicha corporación la que determina quien puede ser admitido a sus facilidades y quien puede ser miembro. Arguyó que el apelante actuó de forma disruptiva, agresiva y hostigadora hacia empleados, oficiales y directores de la corporación; por lo cual, se le prohibió el acceso y participación en las actividades de la YMCA-SJ. Así, añadió que no responde personalmente a la parte apelante, pues no existe una relación contractual entre ambos. Por último, expresó que conforme a un *Acuerdo de Terminación del Empleo y Relevo* (Acuerdo) que firmó el apelante con la YMCA-SJ el 25 de agosto de 2016, el apelante estaba impedido de incoar la reclamación de autos.

Posteriormente, el 22 de febrero de 2023, Mabel Román presentó una *Contestación a Demanda.* En la misma, adoptó las mismas alegaciones presentadas por Allan Charlotten. Específicamente, adujo que no otorgó una membresía vitalicia a la

parte apelante, pues no era empleada de la YMCA-SJ a la fecha de los presuntos hechos. Además, señaló que actuó como Directora Ejecutiva de la corporación y no en su capacidad personal, por lo que no le responde a la parte apelante.

Entretanto, el 27 de febrero de 2023, la YMCA-SJ presentó una *Contestación a la Demanda y Reconvención*. En síntesis, sostuvo que el 25 de agosto de 2016, suscribió un *Acuerdo de Terminación de Empleo y Relevo* con la parte apelante. Señaló que en dicho Acuerdo la parte apelante le relevó de múltiples causas de acción, incluyendo acciones de daños e incumplimiento de contrato. Así pues, alegó que las reclamaciones de la parte apelante son inmeritorias e improcedentes. Explicó, además, que ni los documentos organizacionales ni los estatutos de la corporación permiten una membresía vitalicia, por lo que cualquier concesión de este tipo de membresía, de haberse emitido, carece de validez.

Asimismo, afirmó que el apelante además de incumplir con el Acuerdo también incumplió con los reglamentos internos de la YMCA-SJ durante sus visitas y perturbó reiteradamente las operaciones y buen funcionamiento de dicha entidad. Finalmente, planteó que la parte apelante violó sus obligaciones dimanantes del Acuerdo e ignoró las múltiples advertencias para que cesara y desistiera el uso no autorizado del nombre, marca y logo de la YMCA-SJ para lucrarse.

En su *Reconvención*, la YMCA-SJ señaló que el Acuerdo que firmó el apelante le prohibía el uso de propiedad de la YMCA-SJ y compartir información de esta. Enfatizó que la parte apelante se obligó a devolver todos los récords, documentos, archivos, propiedad o materiales de cualquier clase, así como no retendría copias o reproducciones de dichos materiales. Indicó que, a pesar de esto, en los expedientes de la YMCA-SJ no surge evidencia sobre que este cumplió con su obligación de devolver estos materiales

incumpliendo así los términos del Acuerdo. Manifestó que conforme una cláusula de penalidad del Acuerdo, el apelante está obligado a devolver el 80% del monto que se le pagó, lo que equivale a $15,000.00. Además, coligió que la parte apelante utilizó dichos materiales para utilizar el nombre, el logo y la marca de la YMCA-SJ en sus comunicaciones a terceros para su lucro personal, lo cual constituye una violación a la Ley de Marcas del Gobierno de Puerto Rico (10 LPRA sec. 223 *et seq*.) y la Ley Federal Lanham Act (15 USC sec. 1051 *et seq*.), así como daños estimados en una cantidad no menor de $100,000.00.

Así las cosas, el 17 de marzo de 2023, la parte apelante presentó una *Contestación a Reconvención.* Luego de varios incidentes procesales, innecesarios pormenorizar, el 20 de mayo de 2024, la YMCA-SJ presentó una *Solicitud de Sentencia Sumaria […].* En esta, adujo que procede la desestimación de la *Demanda*, ya que en ninguno de sus documentos corporativos o reglamentos se autorizan membresías vitalicias. Sostuvo que conforme a sus artículos de incorporación presentados en el Departamento de Estado hace más de 110 años se indica la obligatoriedad del pago. Así pues, señaló que según surge de la penúltima enmienda a los artículos de incorporación en el año 1954, se establece el pago de la membresía como una de las condiciones a todos sus socios.

En la alternativa, la YMCA-SJ solicitó la desestimación debido a que como entidad privada se reserva el derecho de admisión a sus miembros o participantes de sus programas. Asimismo, reiteró que conforme a la *Reconvención* presentada el apelante incumplió con los términos del acuerdo; por lo tanto, procede que devuelva a la YMCA-SJ el 80% del monto pagado a su terminación. Igualmente, solicitó que se declare que la parte apelante infringió la Ley de Marcas del Gobierno de Puerto Rico, *supra* y los derechos sobre la marca, imágenes o información propietaria de la YMCA-SJ.

De igual forma, el 20 de mayo de 2024, Mabel Román y Allan Charlotten presentaron una *Solicitud de Sentencia Sumaria de la Parte Codemandada*. En síntesis, expresaron que de la *Demanda* no se desprende la existencia de alegaciones o evidencia que establezca que suscribieron un contrato con el apelante, en su carácter personal. Indicaron, además, que no existen alegaciones o evidencia que establezca su responsabilidad en carácter personal por algún acto u omisión negligente en contra de la parte apelante. Añadieron que no existe base jurídica alguna que establezca que responden por sus actos como Directora Ejecutiva y Presidente de la YMCA-SJ y que no existe evidencia alguna que sustente los daños alegados en la *Demanda*.

Ese mismo día, la parte apelante presentó una *Solicitud de Sentencia Sumaria*. Alegó que entre las partes hubo un contrato donde la YMCA-SJ le concedió la membresía vitalicia que disfrutó por más de 28 años hasta que esta última unilateralmente y sin razón la canceló, lo cual le ocasionó daños. Añadió que a pesar de que la YMCA-SJ razonó que los estatutos no contemplan las membresías vitalicias, estos tampoco la prohíben. Así pues, arguyó que en 1992 la Junta de Directores y el Director Ejecutivo de la YMCA-SJ, dentro de lo permitido por los estatutos, establecieron y otorgaron una categoría de membresía vitalicia a este. Disputó que por más de 28 años la YMCA-SJ le honró la membresía vitalicia y que incluso fue CEO y Director Ejecutivo de la corporación.

Por otra parte, la parte apelante adujo que en la actividad del centenario la YMCA-SJ concedió 5 membresías vitalicias adicionales las cuales fueron avaladas por el presidente de la organización en ese momento. Reiteró que dichas actuaciones le han causado un daño irreparable a su legado dentro y fuera de la YMCA-SJ como deportista y como persona, por lo que los apelados responden por los daños y perjuicios que ha sufrido.

En vista de ello, el 21 de junio de 2024, Mabel Román y Allan Charlotten presentaron una *Oposición a Solicitud de Sentencia Sumaria del Demandante*. Afirmaron que actuaron en todo momento dentro de sus capacidades como Directora Ejecutiva y Presidente de la YMCA-SJ y no en su capacidad personal. Disputaron que la única responsabilidad que tienen es proteger los intereses y derechos de la YMCA-SJ, por lo que solo responderían por negligencia crasa frente a la corporación, no hacia la parte apelante. Así, reiteraron que no otorgaron un contrato de membresía vitalicia al apelante.

En igual fecha, la YMCA-SJ presentó una *Oposición a Solicitud de Sentencia Sumaria del Demandante y Reiterando Solicitud de Sentencia Sumaria de la YMCA-SJ*. En apretada síntesis, alegó que procede la desestimación de la *Demanda* debido a que el presunto contrato de membresía vitalicio es contrario a los artículos de incorporación y los estatutos corporativos. Arguyó que cualquier membresía vitalicia que el apelante haya recibido que no conlleve el pago es nula e inoficiosa. Sostuvo, además, que la parte apelante incumplió con las normas de la YMCA-SJ, por lo que procede terminar todo vínculo con este.

Simultáneamente, el 21 de junio de 2024, la parte apelante presentó su *Oposición a Sentencia Sumaria Presentada por la YMCA-SJ*. A grandes rasgos, manifestó que el Tribunal debía denegar la solicitud de sentencia sumaria que presentó la YMCA-SJ debido a la existencia de controversia de hechos en cuanto a la otorgación de los pases vitalicios a su persona, la cancelación unilateral de este pase vitalicio, la violación del acuerdo y la presunta violación a la Ley de Marcas del Gobierno de Puerto Rico, *supra*. Así pues, esgrimió que la YMCA-SJ nunca estableció cual fue la conducta que mereció que no se le permitiera estar en los predios de la YMCA-SJ, así como participar de sus actividades.

Luego de examinar las alegaciones de las partes, las solicitudes de sentencia sumaria y sus correspondientes oposiciones, así como los documentos que se acompañaron con tales escritos, el 1 de octubre de 2024, notificada el 3 de octubre de 2024, el foro primario emitió una *Sentencia Parcial* mediante la cual formuló las siguientes determinaciones de hechos:

1. La YMCA-SJ es una corporación sin fines de lucro organizada y existente al amparo de las leyes del Estado Libre Asociado desde el 3 de febrero de 1914.

2. La YMCA-SJ es una institución multidisciplinaria enfocada en diversas necesidades sociales que cuenta con programas y servicios especializados como el Centro de Desarrollo Preescolar y Kids para infantes, niños desde 2 meses a 5 años, acuaeróbicos adaptados, gimnasio con servicios de salud y bienestar para promover vidas saludables (*Wellness Center*), deportes, entre otros.

3. La YMCA-SJ ha ofrecido servicios a las comunidades que sirve de forma ininterrumpida por más de 110 años.

4. Los Artículos de Incorporación de la YMCA-SJ, al momento de su organización en el 1914 disponían que para ser miembro se requería el pago de una suma anual:

   Any young man of good moral character may become a member upon payment of the anual fee […].

5. El Certificado de Incorporación de la YMCA-SJ, según su enmienda de 1954, establece que pago como requisito a todo miembro:

   (3) "Membership in this Association shall be open to persons of good moral character, eight years of age and over, who have paid the membership fees and who have met such other requirements as may be prescribed from time to time by the Board of Directors, irrespective of their religious faith and church membership. When parents accompany children in activities the mínimum age limit may be waived.

6. Los Estatutos Corporativos disponen que podrán ser miembros de la YMCA-SJ toda persona que comparta los principios de la YMCA y haya pagado la membresía anual.

   Section 1.
   Who Can Be a Member

   The YMCA DE SAN JUAN is committed to a diversity and inclusive culture. All persons are welcome to become members of the YMCA DE SAN JUAN. Any person who shares the basic principles of the YMCA and has paid the annual membership may become a member of the YMCA DE SAN JUAN in accordance with the requirements established by the Board of

> Directors, regardless of their religious beliefs. The membership is open to all and financial aid is available for those who cannot afford the full cost of the membership, subject to the availability of such assistance. The Board of Directos may establish categories, criteria, costs, and membership requirements.

7. Según la misma sección de los Estatutos Corporativos, el Director Ejecutivo será el responsable de mantener los récords del estatus de membresía de todos los miembros. En específico dispone que este: El Director Ejecutivo (CEO) y/o su designado será responsable de mantener registros correctos del estatus de la membresía de todos los miembros y de emitir tarjetas de identificación firmadas por el Director Ejecutivo (CEO) o debidamente identificadas con su nombre a los miembros al momento del pago de sus cuotas anuales, indicando la fecha de expiración de la membresía. Tal tarjeta de identificación constituirá prueba prima facie del estatus activo del miembro.

> The Executive Director (CEO and/or his/ her designee shall be responsible for maintaining accurate records of the membership status of all members and for issuing identification cards signed by the Executive Director (CEO) or duly identified with his/her name to the members at the time of payment of their anual dues, showing the expiration date of the membership. Such identification card shall constitute prima facie evidence of the active status of the member. Each quarter, the Executive Director will submit an active members status report to the Governance Committee/ Executive Board: status, changes in membership leves, non-renewed memberships, and an análisis related to these changes.

8. Según los Estatutos Corporativos de la YMCA-SJ, la Junta de Directores puede establecer categorías, criterios, costos y requisitos de membresía.

9. Diego Martin nunca ha pagado una membresía a la YMCA-SJ.

10. Cuando Diego Martin era Director Ejecutivo de la YMCA-SJ se celebró la actividad del centenario de esta donde este otorgó a cuatro personas: Flor Meléndez, Sammy Betancourt, Richard Carrión y Tuto Marchand membresías vitalicias.

11. Diego Martin otorgó una membresía vitalicia posteriormente a Elliot Castro.

12. Diego Martin declaró que como Director Ejecutivo de la YMCA-SJ tenía la potestad de otorgar membresías vitalicias sin contar con aprobación o autorización de la Junta de Directores. Este basó su autoridad en que, así como recibió su membresía de una anterior Directora Ejecutiva de la YMCA-SJ, Nelly Dávila, este también tenía esta autoridad.

13. Diego Martin fue el Director Ejecutivo y CEO de la YMCA-SJ desde el 5 de mayo de 2013 hasta el 24 de agosto de 2016.

14. Diego Martin tiene tres tarjetas de identificación de la YMCA-SJ que disponen que son vitalicias o que lo hacen un "*Life Member*".

15. Según se desprenden de dos de estas tarjetas de identificación, estas fueron firmadas por Juan P. Santiago como presidente y Nelly Dávila como Directora Ejecutiva.

16. El 4 de mayo de 2013, el entonces Presidente de la Junta de Directores de la YMCA-SJ Paul Vilaró reconoció la membresía vitalicia de Diego Martin expedida por Nelly Dávila.

17. El 27 de abril de 2021 la YMCA-SJ, a través de su Directora Ejecutiva, le indicó al Demandante que no reconoce su presunta membresía vitalicia. En esta carta expuso específicamente que:

Señor Martin:

El personal de la YMCA-SJ ha referido a nuestra atención varias situaciones preocupantes en cuanto a su conducta durante sus visitas a nuestras facilidades. Primero, deseamos establecer que no reconocemos la "membresía vitalicia" que dice usted ostentar, dado a que los estatutos de la YMCA de San Juan no hacen referencia a "membresías vitalicias".

18. La Junta de Directores de la YMCA-SJ no emitió ninguna Resolución referente a Membresías Vitalicias.

19. Mabel Román, la Directora Ejecutiva de la YMCA-SJ rechazó una oferta del Demandante para mantener su membresía pagando.

20. Para el 26 de abril de 2021, la Directora Ejecutiva de la YMCA-SJ, Mabel Román, discutió el tema de las membresías vitalicias con el Sr. Paul Vilaró que en ese momento no era parte de la Junta de Directores de la YMCA ni era empleado de la YMCA.

21. Mabel Román, como Directora Ejecutiva de la YMCA-SJ fue informada por su personal que en repetidas ocasiones el Demandante Reconvenido incurrió en conducta impropia en la YMCA-SJ, incluyendo, pero no limitado a: (i) no seguir las normas de la institución ni las directrices de su personal; (ii) entrada a áreas de acceso restringido; (iii) interrupción de reuniones sin autorización; (iv) no proveer documento médico requerido conforme a la reglamentación del DRD y de la propia YMCA.

22. La Directora Ejecutiva informó a la Junta de Directores de su determinación de impedir el acceso al Demandante a las facilidades de YMCA-SJ posterior al envío de la carta.

23. Luego de recibir por escrito las quejas sobre Diego Martin, Mabel Román ni la YMCA-SJ no llevaron a cabo una

investigación formal, no entrevistaron a Diego Martin ni se hizo un informe.

24. La Junta de Directores de la YMCA-SJ no emitió ninguna resolución y/o minuta referente a que la codemandada Mabel Román informó que tomó la decisión de no permitir la entrada de la parte demandante a las facilidades de la YMCA-SJ.

25. El 2 de julio de 2021, la parte demandante por conducto de su representación legal, le envió una carta a Mabel Román y se le copió a todos los miembros de la Junta de Directores de la YMCA-SJ, indicándole entre otras cosas que: ostentaba un pase vitalicio, que solicitó que se le explicara las alegadas conductas impropias dentro de la YMCA-SJ; se le solicitó que produjera la Resolución de la Junta de Directores de la YMCA-SJ autorizando la cancelación de los pases vitalicios y la notificación a todos los miembros vitalicios de la referida cancelación de sus pases.

26. El 19 de julio de 2021 y el 11 de agosto de 2021 el Lcdo. Arturo Negrón Vargas en representación de la YMCA, notificó a la Lcda. Aida L. Rodríguez que se encontraban analizando la solicitud del 2 de julio de 2021 y que estarían respondiendo la misma de forma sustantiva en los próximos días.

27. El 30 de agosto de 2021, el Lcdo. Arturo Negrón Vargas, en representación de la YMCA-SJ, envió una carta a la representación legal de la parte demandante indicando que se reiteran en no reconocer la membresía vitalicia de Diego Martin, que se le prohíbe la entrada a las facilidades de la YMCA-SJ y a cualquier actividad organizada por la YMCA-SJ.

28. El 11 de enero de 2022, Diego Martin, por conducto de su representación legal, envió una carta a Mabel Román y se le copió a todos los miembros de la Junta de Directores de la YMCA, nuevamente solicitándole entre otras cosas que: Fecha y descripción de las alegadas situaciones preocupantes de conducta impropia que incurrió el demandante Diego Martin, Testigos de estas actuaciones y se le solicitó que produjera la Resolución de la Junta de Directores de la YMCA autorizando la cancelación de los pases.

29. Allan Charlotten, como Presidente de la Junta de Directores de la YMCA-SJ, avaló la determinación de no permitir a Diego Martin en las facilidades a base del historial de este.

Hechos sobre el Acuerdo:

30. El 25 de agosto de 2016, el demandante Diego Martin suscribió un Acuerdo de Terminación de Empleo y Relevo con la YMCA de San Juan Inc. ("Acuerdo").

31. El Acuerdo dispuso que Diego Martin recibiría un pago especial por terminación de empleo ascendente a tres meses de sueldo básico.

32. El pago especial de tres meses de sueldo básico que recibió Diego Martin por concepto del pago especial ascendió a $13,846.17.

33. El Acuerdo disponía que Diego Martin tenía la obligación de devolver:

> todos los récords, documentos, archivo, propiedad, o materiales de cualquier clase, que contengan información confidencial relacionada con la YMCA o que haya sido recibida o preparada por el Empleado en relación con su empleo, y que el Empleado no retendrá copias o reproducciones de dichos materiales. Dicha propiedad incluye, sin limitación, datos, informes, correspondencia, memorandos, fórmulas, formularios, presupuestos, planes promocionales, planes de mercado, datos financieros de cualquier tipo o naturaleza, equipos, vehículos, llaves, tarjetas corporativas y celular, según sea aplicable. Además, el Empleado recuerda que no habrá divulgar o utilizar documentos o información confidencial de la YMCA a la que haya tenido acceso durante su incumbencia y que constituyan propiedad de la YMCA, excepto con el previo consentimiento por escrito YMCA o sus sucesores en interés.

34. Diego Martin recibió un correo electrónico sobre requerimiento de cese y desista y requerimiento de cumplimiento inmediato. Ante esto, el 11 de noviembre de 2016 le contestó que:

> 1. No creo que yo haya incumplido con el Acuerdo de Terminación de Empleo o cualquier incumplimiento no fue intencional.
> 2. Para evitar cualquier controversia innecesaria, en el futuro no divulgaré a terceros ni postearé en el internet información o datos financiera de la YMCA de San Juan. Tampoco compartiré con terceros datos, informes, correspondencia, memorandos, fórmulas, formularios, presupuestos, planes promocionales, planes de mercado, información de mercado, a la cual tuve acceso durante mi empleo en la Y, excepto con el previo consentimiento escrito de la Y.
> 3. Sin embargo, dado que estoy en el proceso de búsqueda de empleo, entiendo que puedo compartir con patronos potenciales aquella información no confidencial de la Y, con el fin exclusivo de demostrar mi ejecutoria.

35. En el presente, Diego Martin es el Director Ejecutivo de la Fundación Emilio Millo Romera (la "Fundación").

36. El demandante es *"Chief Executive Officer"* de la Fundación desde enero de 2020 hasta el presente.

37. Obtuvo la posición por su relación con el Sr. Edmund Santiago, fundador de la Fundación, y por haber sido

director ejecutivo de la YMCA-SJ para el periodo de mayo de 2013 a octubre de 2016.

38. La Fundación se enfoca en desarrollar programas juveniles enfocados en educación, recreación y deportes.

39. La Fundación tiene alianzas con otras organizaciones como la Organización Exalumnos de la Academia del Perpetuo Socorro, donde tiene la beca Millo Romera hace tres años.

40. Diego Martin es responsable de "busca[r] partners que deseen colaborar con la Fundación para poderlos apoyar.

41. El 7 de febrero de 2020, Lydia Figueroa, entonces Directora Ejecutiva de la YMCA-SJ emitió una carta en la que dispuso que:

> Estimados potenciales colaboradores:
>
> Por la presente reconocemos el patrocinio de la Fundación Emilio "Millo" Romero Cuevas, Inc. y su representante autorizado el Sr. Diego Martin, quienes como entidad filantrópica han elaborado un plan de desarrollo a los fines de apoyar la misión y objetivos de la YMCA de San Juan para con la comunidad.
>
> A estos fines, autorizamos a ambos a representar a la YMCA de San Juan en los esfuerzos de recaudación de fondos, relaciones con la comunidad y esfuerzos de responsabilidad social empresarial.

42. El 13 de marzo de 2020, Edmund Santiago, Chairman y CEO de Redbridge, le envió una carta a Diego Martin disponiendo que:

> De acuerdo a nuestra conversación de hace unos días y el correo que te envié del (sic) Sr. Guillermo Marxuach, te confirmo que la Fundación Emilio "Millo" Romero debe cesar las actividades de recaudación de fondos para Y de San Juan hasta que se llegue a un acuerdo que sea viable y aceptable bajo los estatutos de la Y de San Juan y los parámetros que estipula YUSA.

43. También el 13 de marzo de 2020 Diego Martin se comprometió a "Posponer todas las visitas y seguimientos potenciales hasta el 25 de marzo, cuando YUSA [YMCA USA] viene a reunión para atender temas de dirección administrativa y Junta de Directores.

44. El 13 de marzo de 2020, además, por voz del codemandado Allan Charlotten, la YMCA-SJ le instruyó a la Fundación: "Por el momento te sugiero que Diego no realice ninguna llamada, ninguna comunicación y ningún contacto. No debe hablar con nadie."

45. El 13 de marzo de 2020, la Fundación, por voz del Sr. Edmund Santiago respondió la solicitud de la YMCA-SJ: "Sí (sic) está notificado".

46. El 17 de agosto de 2020, la YMCA-SJ por medio de Allan Charlotten le envió una carta por correo electrónico a Diego Martin donde se le informó que la determinación de la YMCA-SJ sobre que no generaría una contratación con la Fundación conforme al modelo de negocios presentado.

47. Según se desprende de una presentación o promoción de la Fundación con fecha de 26 de octubre de 2020, esta utilizó la marca de la YMCA-SJ y sus materiales promocionales.

48. Diego Martin declaró que la presentación del 26 de octubre de 2020 sobre como la Fundación estaba buscando inversionistas la preparó este "[e]n conjunto con la YMCA, en principio".

49. La Fundación Millo Romero no es parte del pleito.

Así, en la *Sentencia Parcial* emitida, el foro primario concluyó que la membresía vitalicia no es válida, por lo que tampoco existió el presunto incumplimiento contractual por parte de la YMCA-SJ. Así pues, razonó que a la parte apelante admitir que nunca pagó las cuotas requeridas por la YMCA-SJ, tampoco era miembro de la entidad. Esbozó, además, que la YMCA-SJ tenía y tiene pleno derecho a prohibirle la entrada a la parte apelante al no cumplir con los requisitos. Consecuentemente, determinó que no procedían las alegaciones sobre los daños sufridos por el presunto incumplimiento contractual de la YMCA-SJ.

Asimismo, el TPI expuso que tampoco procede la reclamación por responsabilidad por parte de Mabel Román y Allan Charlotten en sus capacidades personales, así como en sus capacidades como directivos de la YMCA-SJ. Sostuvo que el apelante no demostró que existen alegaciones ni prueba suficiente para imponerle responsabilidad a la YMCA-SJ, a Mabel Román y Allan Charlotten, tanto en sus capacidades personales como en representación de la YMCA-SJ; por lo tanto, desestimó la causa de acción de incumplimiento de contrato y daños y perjuicios en contra de estos.

Finalmente, por existir hechos materiales en controversia sobre si efectivamente la parte apelante llevó a cabo actos en contra del Acuerdo que otorgó con la YMCA-SJ, así como, si le sacó

provecho o beneficios a la marca de la YMCA-SJ en contra de la Ley de Marcas del Gobierno de Puerto Rico, supra, el TPI *ordenó* la continuación de los procedimientos.

En vista de ello, el 18 de octubre de 2024, la parte apelante presentó una *Moción de Reconsideración*. El 21 de octubre de 2024, el TPI emitió una *Resolución* mediante la cual declaró *No Ha Lugar* la solicitud de reconsideración.

Insatisfecho, el 20 de noviembre de 2024, la parte apelante compareció ante *nos* mediante un recurso de *Apelación* y señaló la comisión de los siguientes errores:

> **Primer Error:** Erró el TPI al concluir que los estatutos corporativos de la YMCA-SJ para ser considerado miembro, es pagando una cantidad de dinero y debido a que Diego Martin nunca pagó una membresía no puede catalogarse como miembro, a pesar de que a este presuntamente se le haya otorgado una membresía vitalicia.

> **Segundo Error:** Erró el TPI al resolver sumariamente la controversia de la validez de las membresías vitalicias amparándose únicamente en que los estatutos corporativos de la YMCA-SJ no lo permiten (a pesar de que los propios estatutos no lo prohíben) obviando la contundente evidencia admisible presentada de tres pases vitalicias y declaraciones juradas donde se estableció la existencia y validez de las membresías vitalicias, y aceptadas por la propia YMCA-SJ.

> **Tercer Error:** Erró el TPI [al determinar] que las membresías vitalicias otorgadas por la YMCA-SJ no fueron establecidas por Resolución de la Junta de Directores [por lo que] las mismas son improcedentes.

> **Cuarto Error:** Erró el TPI al concluir que los apelados Mabel Román ni Allan Charlotten actuaron en sus capacidades personales, y mucho menos que hayan actuado u omitido actos mediando culpa o negligencia al no permitir que Diego Martin pudiera estar en los predios de la YMCA-SJ o en sus actividades. En cualquier caso, si estos actuaron de alguna manera en contra de Diego Martin, fueron en sus capacidades como Directora Ejecutiva y como parte de la Junta de Directores de la YMCA-SJ prohibiéndole la entrada a alguien que no cumplió con los requisitos de ser miembro.

Examinado el recurso de apelación, el 6 de diciembre de 2024, este Tribunal emitió una *Resolución* concediéndole un término de veinte (20) días a la parte apelada para que presentara su posición

al recurso. El 2 de enero de 2025, la parte apelada presentó una *Oposición a Apelación*. Con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

## A. Sentencia sumaria

Como es sabido, la Regla 36 de Procedimiento Civil (32 LPRA Ap. V) regula todo lo relacionado a la moción de sentencia sumaria. *Cruz Cruz y otros v. Casa Bella Corp.*, 2024 TSPR 47, 213 DPR ___ (2024); *Acevedo y otros v. Depto. Hacienda y otros*, 212 DPR 335 (2023). Dicho mecanismo procesal es utilizado en aquellos litigios que no presentan controversias genuinas de hechos materiales y que, por consiguiente, la celebración de un juicio en su fondo no es necesaria en la medida que solo resta por dirimir determinadas controversias de derecho. *Oriental Bank v. Caballero García*, 212 DPR 671 (2023). Véase, además, *Acevedo y otros v. Depto. Hacienda y otros, supra*; *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310 (2021). Según ha resuelto nuestro Tribunal Supremo, un hecho material es aquel que puede alterar la forma en que se resuelve una reclamación, de acuerdo con el derecho sustantivo aplicable. *Cruz Cruz y otros v. Casa Bella Corp., supra*.

El propósito que persigue el mecanismo de la sentencia sumaria es que los pleitos civiles sean solucionados de forma justa, rápida y económica. *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601 (2023). Véase, además, *Acevedo y otros v. Depto. Hacienda y otros, supra*; *SLG Fernández-Bernal v. RAD-MAN et al., supra*; *Rodríguez Méndez v. Laser Eye et al.*, 195 DPR 769 (2016). Por tanto, quien promueva la sentencia sumaria deberá establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material. *Oriental Bank v. Caballero García, supra*. Así, la Regla 36.3 de Procedimiento Civil (32 LPRA Ap. V), establece cual será el contenido y los requisitos de forma que deberán observarse tanto en la solicitud de sentencia sumaria que inste la parte

promovente, como en la oposición que pueda presentar la parte promovida. *Acevedo y otros v. Depto. Hacienda y otros, supra*; *León Torres v. Rivera Lebrón*, 204 DPR 20 (2020).

Por ser la sentencia sumaria un remedio discrecional, el principio rector para el uso de este mecanismo es el sabio discernimiento del juzgador, ya que mal utilizada puede privar a una parte de su día en corte, principio elemental del debido proceso de ley. *Jusino et als. v. Walgreens*, 155 DPR 560 (2001). Así pues, un tribunal podrá emitir una sentencia sumaria si de las alegaciones, deposiciones, contestaciones, interrogatorios y admisiones ofrecidas, junto a las declaraciones juradas – según fueran ofrecidas – surge que no existe una controversia real sustancial en cuanto a ningún hecho material, restando entonces resolver la controversia en estricto derecho. *Acevedo y otros v. Depto. Hacienda y otros, supra*; Regla 36.3 de Procedimiento Civil, *supra*. Así pues, resulta esencial que de la prueba que acompaña la solicitud de sentencia sumaria surja de manera preponderante que no existe controversia sobre los hechos medulares del caso. *Cruz Cruz y otros v. Casa Bella Corp., supra*.

Así, para sostener u oponerse a una petición de sentencia sumaria las partes podrán presentar, entre otras, las siguientes piezas de evidencia: certificaciones, documentos públicos, admisiones de la parte contraria, deposiciones, contestaciones a interrogatorios, declaraciones juradas o affidavits, y hasta prueba oral. *Acevedo y otros v. Depto. Hacienda y otros, supra,* citando a R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta ed., San Juan, LexisNexis, 2017, pág. 318. Nuestro máximo Foro ha sido enfático en que, cuando una parte acompaña su solicitud u oposición de sentencia sumaria de una o varias declaraciones juradas, estas deben cumplir con las disposiciones

especiales pautadas en la Regla 36.5 de Procedimiento Civil (32 LPRA Ap. V). *Acevedo y otros v. Depto. Hacienda y otros, supra.*

A esos efectos, se requiere que las declaraciones juradas demuestren afirmativamente el conocimiento personal y la calificación del testigo, también se requiere que se presenten únicamente hechos admisibles como evidencia en un juicio. Hernández Colón, *op. cit.* pág. 319. Por consiguiente, cuando la solicitud de sentencia sumaria está apoyada en una o varias declaraciones juradas, dicha prueba no podrá contener solo conclusiones sin hechos específicos que las sustenten. *Acevedo y otros v. Depto. Hacienda y otros, supra.* Lo anterior, serían meras conclusiones reiterando las alegaciones de la demanda y, por tanto, prueba insuficiente y sin valor probatorio. *Íd.* citando a J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. J.T.S., 2000, T. I, págs. 615-616.

El Tribunal Supremo de Puerto Rico ha sido enfático en que, el hecho de que la parte promovida no presente prueba que controvierta la evidencia presentada por la parte promovente de la moción de sentencia sumaria, no implica que dicha moción procederá automáticamente si efectivamente existe una controversia sustancial sobre hechos materiales. *Acevedo y otros v. Depto. Hacienda y otros, supra*; *SLG Fernández-Bernal v. RAD-MAN et al., supra.* Ahora bien, nuestro máximo Foro ha reiterado que una moción de sentencia sumaria no procederá cuando: (1) existen hechos materiales controvertidos (2) hay alegaciones afirmativas en la demanda que no han sido refutadas (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material, o (4) como cuestión de derecho no procede. *Acevedo y otros v. Depto. Hacienda y otros, supra.* Véase, además, *SLG Fernández-Bernal v. RAD-MAN et al., supra*; *Vera v. Dr. Bravo,* 161 DPR 308 (2004).

De igual forma, el mecanismo de sentencia sumaria no es utilizable cuando existen controversias de hechos materiales sobre elementos subjetivos de intención, propósitos mentales o negligencia. *Cruz Cruz y otros v. Casa Bella Corp.*, *supra*. Véase, además, *Acevedo y otros v. Depto. Hacienda y otros*, *supra*; *Velázquez Ortiz v. Mun. de Humacao*, 197 DPR 656 (2017); *Ramos Pérez v. Univisión*, 178 DPR 200 (2010); *Soto v. Hotel Caribe Hilton*, 137 DPR 294 (1994). Sin embargo, nada impide que se utilice el mecanismo de sentencia sumaria en reclamaciones que requieran elementos subjetivos o de intención cuando de los documentos a ser considerados en la solicitud de sentencia sumaria surge la inexistencia de controversia en torno a los hechos materiales. *Cruz Cruz y otros v. Casa Bella Corp.*, *supra*.

Además, puntualizamos que al momento de atender una solicitud de revisión de sentencia sumaria los foros apelativos estamos llamados a "examinar el expediente de *novo* y verificar que las partes cumplieron con las exigencias" pautadas en las Reglas de Procedimiento Civil. *Acevedo y otros v. Depto. Hacienda y otros*, *supra*; *SLG Fernández-Bernal v. RAD-MAN et al.*, *supra*; *Rivera Matos et al. v. Triple-S et al.*, 204 DPR 1010 (2020). Según ha establecido el Tribunal Supremo, este Tribunal está limitado a: (1) considerar los documentos y argumentos que se presentaron ante el foro primario (lo cual implica que, en apelación, los litigantes no pueden añadir prueba que no fue presentada oportunamente ante el tribunal de instancia ni esbozar nuevas teorías); (2) determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y (3) determinar si el derecho se aplicó de forma correcta. *González Meléndez v. Mun. San Juan et al.*, *supra*. Así pues, los foros apelativos estamos en la misma posición que los tribunales de instancia y se utilizan los mismos criterios para evaluar una

solicitud de sentencia sumaria. *Íd.* Véase, además, *Cruz Cruz y otros v. Casa Bella Corp.*, *supra.*

### B. Derecho de contratos

El Artículo 1041 del Código Civil de 1930 (31 LPRA ant. sec. 2991) establece que toda obligación consiste en dar, hacer o no hacer una cosa. [1] Así pues, una de las fuentes de las obligaciones son los contratos. Artículo 1042 del Código Civil de 1930 (31 LPRA ant. sec. 2992).

Cónsono con esto, nuestro ordenamiento jurídico permite la libertad de contratación; siempre y cuando, los pactos, cláusulas y condiciones no sean contrarios a la ley, la moral o al orden público. Artículo 1207 del Código Civil de 1930 (31 LPRA ant. sec. 3556). Si se cumple con lo dispuesto, el contrato tendrá fuerza de ley entre las partes, por lo que ambas se obligan al cumplimiento de lo allí pactado y de sus consecuencias. Artículos 1044 y 1210 del Código Civil de 1930 (31 LPRA ant. sec. 2995 y 3375). En adición, "cuando los términos de un contrato son claros y no crean ambigüedades, estos se aplicarán en atención al sentido literal que tengan". *C.F.S.E. v. Unión de Médicos*, 170 DPR 443 (2007).

A su vez, los contratos existen desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o a prestar algún servicio. Artículo 1206 del Código Civil de Puerto Rico (31 LPRA ant. sec. 3371)*; García Reyes v. Cruz Auto Corp.*, 173 DPR 870 (2008). Así pues, la existencia de un contrato se constata cuando concurren los siguientes requisitos: (1) consentimiento de los contratantes; (2) objeto cierto que sea materia del contrato; y (3) causa de la obligación que se establezca. Artículo 1213 del Código Civil de Puerto Rico (31 LPRA ant. sec. 3391); *García*

---

[1] Aunque el Código Civil citado, Código Civil de Puerto Rico de 1930, fue derogado por la Ley Núm. 55-2020, conocido como Código Civil de Puerto Rico, hacemos referencia al primero por ser el que estaba vigente a la fecha de la controversia de autos.

*Reyes v. Cruz Auto Corp., supra,* a la pág. 885. Una vez concurren las condiciones esenciales para su validez, un contrato es obligatorio "cualquiera que sea la forma en que se haya celebrado". Artículo 1230 del Código Civil de Puerto Rico (31 LPRA ant. sec. 3451).

**C. La causa de acción de daños y perjuicios**

El Artículo 1802 del Código Civil de 1930 (31 LPRA ant. sec. 5141) establece que: "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". Como sabemos, en materia de daños y perjuicios, para que prospere una reclamación bajo el precitado artículo, tiene que darse la concurrencia de tres elementos básicos a saber: (1) un acto u omisión culposo o negligente del demandado (2) la presencia de un daño físico o emocional en el demandante y (3) que exista un nexo causal entre el daño sufrido y el acto u omisión. *Sucesión Mena Pamias et al. v. Jiménez Meléndez et al.*, 212 DPR 758 (2023). Véase, además, *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465 (2022); *Pérez et al. v. Lares Medical et al.*, 207 DPR 965 (2021); *Nieves Díaz v. González Massas*, 178 DPR 820 (2010).

El *acto culposo o negligente* se define como la falta del debido cuidado, según la figura de la persona de prudencia común y ordinaria. *Pérez et al. v. Lares Medical et al.*, *supra*; *López v. Porrata Doria*, 169 DPR 135 (2006). Sobre el concepto de *culpa,* nuestro más alto Foro ha reiterado que consiste en no anticipar las consecuencias racionales de un acto u omisión. *López v. Porrata Doria*, *supra*, pág. 151. En cambio, la responsabilidad civil extracontractual producida por omisiones negligentes surge cuando el "[a]legado causante del daño quebranta un deber impuesto o reconocido por ley". *Hernández Vélez v. Televicentro*, 168 DPR 803 (2006).

Por otra parte, *el daño* se compone de todo menoscabo material o moral que sufre una persona en sus bienes, propiedad o

patrimonio, por el cual otra persona ha de responder. *García Pagán v. Shiley Caribbean, etc.,* 122 DPR 193 (1988). Es decir, el menoscabo puede infligirse en los bienes vitales naturales, la propiedad o el patrimonio del perjudicado. *Nieves Díaz v. González Massas, supra,* pág. 845. Ahora bien, el daño sufrido debe ser real y palpable, no vago o especulativo. *Soto Cabral v. E.L.A,* 138 DPR 298 (1995). El resarcimiento o indemnización pecuniaria consiste en atribuir al perjudicado la cantidad de dinero suficiente para compensar su interés perjudicado. *García Pagán v. Shiley Caribbean, etc., supra*; *Rodríguez Cancel v. A.E.E,* 116 DPR 443 (1985). Así pues, se requiere la existencia certera de un daño, pues de lo contario el reclamo sería especulativo y no adjudicable en derecho.

En cuanto al requisito de *relación causal,* el estándar aplicable es el de *causalidad adecuada.* La *doctrina de la causalidad adecuada* – la cual rige en Puerto Rico - dispone que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Sucesión Mena Pamias et al. v. Jiménez Meléndez et al., supra*; *Nieves Díaz v. González Massas, supra.* La *relación causal* - imprescindible en una reclamación en daños y perjuicios- es un elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico. *Nieves Díaz v. González* Massas, *supra,* págs. 844-845. Este concepto de la causa presupone que la ocurrencia del daño que da base a la reclamación sea *previsible* dentro del curso normal de los acontecimientos. *López v. Porrata Doria, supra,* págs. 151-152. Es por esto que, el deber de indemnizar requiere que haya un nexo causal entre el daño y el hecho que lo originó, pues solo se indemnizarán los daños que sean consecuencia del hecho que obliga a la indemnización. *Estremera v. Inmobiliaria Rac. Inc.,* 109 DPR 852 (1980). Así pues, un daño podrá considerarse como el resultado

probable y natural de un acto u omisión negligente, si luego del suceso -mirándolo retrospectivamente- éste parece ser la consecuencia razonable y común de la acción u omisión de que se trate. *Santiago v. Sup. Grande,* 166 DPR 796 (2006).

Los conceptos de *negligencia* y *causalidad adecuada* exigen que, de algún modo, se cumpla con el criterio de previsibilidad. No obstante, para fines de la negligencia, lo importante es identificar si el demandado podía prever que su acción u omisión podría causar algún daño. En otro sentido, con el propósito de determinar si existe causa legal o adecuada, hay que evaluar si el demandado podía prever que su acción u omisión podría causar el tipo de daño que se produjo. *Colón, Ramirez v. Televicentro de P.R.,* 175 DPR 690 (2009).

Sin embargo, no es necesario que se haya anticipado la ocurrencia del daño en la forma precisa en que ocurrió; basta con que el daño sea una consecuencia *natural y probable* del acto u *omisión negligente. Tormos Arroyo v. D.I.P.,* 140 DPR 265 (1996). La omisión que genera responsabilidad civil por negligencia es aquella conducta que constituye el quebrantamiento de un deber de cuidado impuesto o reconocido por ley, cuando de haberse realizado el acto omitido se hubiera evitado el daño. *Soc. Gananciales y. G. Padín, Co., Inc.,* 117 DPR 94 (1986).

## D. La Ley General de Corporaciones

Las Leyes corporativas son instrumentos utilizados por los gobiernos para estimular el desarrollo económico. *Santiago et al. v. Rodríguez et al.,* 181 DPR 204 (2011). Es por esto que las corporaciones son entidades con personalidad jurídica propia y separada de sus miembros o titulares, por la que estos responderán hasta el monto de su inversión en la misma, pero no con sus bienes personales. *Miramar Marine et al. v. Citi Walk et al.,* 198 DPR 684 (2018); C. Díaz Olivo, *Corporaciones: Tratado sobre Derecho Corporativo,* ed. 2016, pág. 15. Una corporación es, pues, una

persona jurídica por virtud del reconocimiento que el Estado hace de dicha condición. *Rivera Maldonado v. E.L.A.*, 119 DPR 74 (1987). Una vez una corporación queda constituida, esta podrá adquirir y poseer bienes de todas clases, como contraer obligaciones, conforme a las leyes, reglas de su constitución y sus estatutos corporativos. A tono con esto, la Ley General de Corporaciones, Ley Núm. 164-2009 (14 LPRA sec. 3501, *et seq.*) se creó a los fines de proveer para los asuntos relativos a la existencia y vida de las corporaciones en Puerto Rico. *Eagle Security v. Efrón Dorado et al.*, 211 DPR 70 (2021).

En lo aquí concerniente, el Artículo 1.02 de la Ley General de Corporaciones (14 LPRA sec. 3502) establece todo aquello que se debe consignar en el certificado de incorporación, entre ello, se debe incluir el nombre de la corporación, la dirección corporativa, el nombre del agente residente, el capital autorizado, la naturaleza de los negocios o propósitos de la corporación y si la corporación se organizará con o sin fines de lucro, entre otros.

Así pues, una corporación requiere un certificado de incorporación el cual es un documento que se presenta ante el Departamento de Estado cuya función principal es celebrar un contrato que le da vida jurídica a la entidad. Díaz Olivo, *op. cit.*, pág. 81. El Departamento de Estado, como parte de sus deberes, tiene a su haber el registro y la emisión final del certificado de incorporación. *Eagle Security Police, Inc. v. Dorado, supra.* Una vez se materializa dicho trámite en la agencia, comienza la personalidad jurídica del nuevo ente – distinta y separada de sus inversionistas – la cual se retrotrae al momento de la presentación inicial del documento en el Departamento de Estado. *Íd.* Así, para que una corporación adquiera personalidad jurídica no es suficiente que presente el certificado de incorporación y pague los derechos

establecidos por ley, sino que es indispensable que se le expida su certificado de incorporación. *Íd.*

Por su parte, los estatutos corporativos son el reglamento interno de la corporación, los cuales son a la vez el contrato entre la corporación, sus funcionarios y accionistas. Díaz Olivo, *op. cit.*, pág. 106. Según ha resuelto nuestro máximo Foro, los estatutos corporativos establecen la manera como una corporación deberá operar. *Herger et al. v. Calidad Vida Vecinal*, 190 DPR 1007 (2014). A esos efectos, el Artículo 1.08 de la Ley General de Corporaciones (14 LPRA sec. 3508), dispone que los estatutos no pueden ser contrarios a la ley, a la política pública ni a lo establecido en el certificado de incorporación. Los estatutos corporativos pueden contener disposiciones referentes a los negocios de la corporación, a la marcha de sus asuntos y a los derechos o poderes de la corporación o de sus accionistas, directores, oficiales o empleados. *Íd*. Véase, además, *Herger et al. v. Calidad Vida Vecinal, supra.*

De otro lado, dado que la corporación tiene una personalidad jurídica separada y un patrimonio distinto al de sus directores y oficiales, las actuaciones corporativas, a través de sus agentes, solamente obligan a la corporación. *Sucn. Santaella v. Srio. de Hacienda*, 96 DPR 442 (1968). Es decir, como norma general, las actuaciones de los oficinales y directores de la corporación no los obligan personalmente, sino que obligan a la entidad que representan. *Rivera Sanfeliz et al. v. Jta. Dir. FirstBank*, 193 DPR 38 (2015). Así, este axioma, conocido como el principio de responsabilidad limitada, constituye un principio básico de derecho corporativo. *In re Amundaray Rodríguez I*, 172 DPR 60 (2007).

Sin embargo, una excepción se configura cuando media negligencia crasa por parte de los directores y oficiales de la corporación. Específicamente, el Artículo 4.03 de la Ley General de Corporaciones (14 LPRA sec. 3563) establece que:

[l]os directores y oficiales estarán obligados a dedicar a los asuntos de la corporación y al desempeño de sus funciones, la atención y el cuidado que en una posición similar y ante circunstancias análogas desempeñaría un director u oficial responsable y competente al ejercer de buena fe su juicio comercial o su mejor juicio en el caso de las corporaciones sin fines de lucro. Solo la negligencia conllevará responsabilidad.

Con relación al concepto de *negligencia crasa*, este debe interpretarse en el contexto del estándar de diligencia y competencia en el descargo de sus funciones. Así pues, limitado a sus deberes frente a los asuntos corporativos y no como una responsabilidad hacia la población general. *Rivera Sanfeliz et al. v. Jta. Dir. FirstBank, supra.* Por el contrario, la interpretación de esta excepción a la responsabilidad personal por parte de los directores y oficiales corporativos debe enmarcarse dentro del deber de fiducia que tienen frente a la corporación; es decir, su deber de desempeñarse de manera capaz y responsable, de cara a los intereses de la entidad que representan. *Íd.* Así, el incumplimiento de estos deberes inherentes a sus funciones hacia la corporación pudiera generar responsabilidad personal a los directores y oficiales. *Íd.* No obstante, esta responsabilidad se producirá exclusivamente de cara a la corporación y únicamente si esta sufre daños como consecuencia de ese quebrantamiento. *Íd.*

**III.**

En el caso ante *nos*, el apelante plantea que erró el TPI al concluir que los estatutos corporativos de la YMCA-SJ para ser considerado miembro, es pagando una cantidad de dinero y debido a que nunca pagó una membresía no puede catalogarse como miembro, a pesar de que a este presuntamente se le haya otorgado una membresía vitalicia. En específico, señala que erró el TPI al resolver sumariamente la controversia de la validez de las membresías vitalicias amparándose únicamente en que los estatutos corporativos de la YMCA-SJ no lo permiten (a pesar de que

los propios estatutos no lo prohíben) obviando la contundente evidencia admisible presentada de tres pases vitalicios y declaraciones juradas donde se estableció la existencia y validez de las membresías vitalicias, y aceptadas por la propia YMCA-SJ. Del mismo modo, el apelante acentúa que erró el TPI al determinar que las membresías vitalicias otorgadas por la YMCA-SJ no fueron establecidas por la Junta de Directores por lo que las mismas son improcedentes.

Un examen minucioso del expediente que nos ocupa nos lleva a concluir que el pronunciamiento que atendemos es uno conforme a derecho y a la prueba presentada. Surge de la prueba de autos, específicamente, de los Artículos de Incorporación y los Estatutos Corporativos de la YMCA-SJ que, desde su incorporación en el 1914, se estableció el requisito del pago de una suma anual a todos sus miembros. Así, de los Artículos de Incorporación surge que *"[a]ny young man of good moral character may become a member upon payment of the anual fee"*. Asimismo, en la enmienda a los Artículos de Incorporación de 1954, la YMCA-SJ estableció, entre otras cosas, que *"[m]embership in this Association shall be open to persons of good moral character, eight years of age and over, who have paid membership fees and who have met such other requirements [...]"*.

Así pues, la obligación de pagar una membresía vitalicia está establecida en los Artículos de Incorporación desde 1914 y ratificada en enmiendas posteriores. Así, de un análisis detallado del Certificado de Incorporación, así como de los Estatutos Corporativos se desprende claramente que el mínimo para ser considerado un miembro de la YMCA-SJ es compartir los principios de la organización y el pago de la cuota anual. No obstante, lo anterior, aun cuando la Junta de Directores tiene la autoridad para establecer los requisitos de membresía, estos no pueden ignorar lo establecido en los Artículos de Incorporación.

Por consiguiente, ante esta realidad, unido al hecho de que el apelante admitió que nunca pagó una membresía a la YMCA-SJ, es forzoso concluir que este no ostenta una membresía vitalicia. Esto, pues, aunque al apelante presuntamente se le haya otorgado dicha membresía, se incumplió con el Certificado de Incorporación y los Estatutos Corporativos; por lo que, la actuación fue una *ultra vires.*

Con relación al argumento de la parte apelante, de que la YMCA-SJ había otorgado otras membresías vitalicias en el 2013, debemos dejar claro que dichas membresías las otorgó el propio apelante cuando fungió como Director Ejecutivo de la YMCA-SJ.

En consecuencia, de los documentos de autos, no surge controversia alguna de hechos materiales y pertinentes con relación a la validez de la membresía vitalicia. Por lo cual, coincidimos con la determinación del foro de instancia de que, ante la inexistencia de la membresía vitalicia, tampoco existió un incumplimiento contractual por parte de la YMCA-SJ y no procede la causa de acción de daños y perjuicios.  En fin, no se cometieron ninguno de los primeros tres (3) errores señalados.[2]

Por último, indica la parte apelante que erró el TPI al concluir que los apelados Mabel Román ni Allan Charlotten actuaron en sus capacidades personales, y mucho menos que hayan actuado u omitido actos mediando culpa o negligencia al no permitir que el apelante pudiera estar en los predios de la YMCA-SJ o en sus

---

[2] En su recurso, la parte apelante plantea que los Estatutos Corporativos que presentó la YMCA-SJ y en los cuales el foro primario sostiene la *Sentencia Parcial* no son de aplicación porque no estaban vigentes al momento en que se le otorgó la presunta membresía vitalicia. Sin embargo, este argumento no fue traído ante la atención del TPI en su oposición a la solicitud de sentencia sumaria. Por lo cual, según lo resuelto por el Tribunal Supremo de Puerto Rico en *Sánchez Ruiz v. Higueras Pérez et al.*, 203 DPR 982 (2020), los foros revisores debemos abstenernos de adjudicar cuestiones no presentadas ni atendidas por los tribunales inferiores. Además, la parte apelante sostiene que el TPI obvió en su totalidad la evidencia presentada, como por ejemplo la Declaración Jurada del Sr. Sammy Betancourt. No obstante, debemos dejar claro que al momento en que el foro primario emitió la *Sentencia Parcial* apelada, la Declaración Jurada del Sr. Sammy Betancourt no era parte del expediente del caso de autos. Aunque se hace mención de dicha Declaración Jurada en la solicitud de sentencia sumaria del apelante, la misma no fue anejada junto con la solicitud en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

actividades y que si estos actuaron de alguna manera en contra suya, fueron en sus capacidades como Directora Ejecutiva y como parte de la Junta de Directores de la YMCA-SJ prohibiéndole la entrada a alguien que no cumplió con los requisitos de ser miembro.

Surge del derecho que antecede que, las corporaciones tienen una personalidad jurídica separada y un patrimonio distinto al de sus directores y oficiales, por lo que las actuaciones corporativas, a través de sus agentes, solamente obligan a la corporación. *Sucn. Santaella v. Srio. de Hacienda, supra.* Por consiguiente, como norma general, las actuaciones de los oficinales y directores de la corporación no los obligan personalmente, sino que obligan a la entidad que representan. *Rivera Sanfeliz et al. v. Jta. Dir. FirstBank, supra.*

Sin embargo, una excepción se configura cuando media negligencia crasa por parte de los directores y oficiales de la corporación. Con relación al concepto de *negligencia crasa,* este debe interpretarse en el contexto del estándar de diligencia y competencia en el descargo de sus funciones. Así pues, limitado a sus deberes frente a los asuntos corporativos y no como una responsabilidad hacia la población general. *Rivera Sanfeliz et al. v. Jta. Dir. FirstBank, supra.* Por el contrario, la interpretación de esta excepción a la responsabilidad personal por parte de los directores y oficiales corporativos debe enmarcarse dentro del deber de fiducia que tienen frente a la corporación; es decir, su deber de desempeñarse de manera capaz y responsable, de cara a los intereses de la entidad que representan. *Íd.*

Así, del expediente ante *nos* no surge evidencia que demuestre que Mabel Román ni Allan Charlotten actuaron en sus capacidades personales. Tampoco, surge prueba de que hayan actuado mediando culpa o negligencia al no permitir al apelante la entrada a las facilidades y actividades de la YMCA-SJ. Por lo tanto, a la luz

del marco jurídico enunciado, es forzoso concluir que Mabel Román y Allan Charlotten actuaron en sus capacidades como Directora Ejecutiva y como Presidente de la Junta de Directores, respectivamente.

Coincidimos con el foro primario, la parte apelante no demostró que existen alegaciones ni prueba suficiente para imponerle responsabilidad a la YMCA-SJ, a Mabel Román y Allan Charlotten, tanto en sus capacidades personales como en representación de la YMCA-SJ.

Así pues, tras ejercer nuestras funciones revisoras, coincidimos con que, en el presente caso, concurren las condiciones procesales propias a la eficacia del mecanismo adjudicativo empleado por la sala sentenciadora en las causas de acción que, al amparo del mismo, dispuso. De igual forma, entendemos que la *Sentencia Parcial* apelada responde a una adecuada interpretación y aplicación del derecho pertinente a la materia que atendemos. Así, se sostiene el dictamen parcial apelado en toda su extensión.

**IV.**

Por los fundamentos antes expuestos, confirmamos la *Sentencia Parcial* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones